FILED
CLERK, U.S. DISTRICT COURT
8/26/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: MMC DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2025 Grand Jury

UNITED STATES OF AMERICA,

Plaintiff,

v.

[redacted]
CHUAN GENG, and
SHIWEI YANG

Defendants.

CR 2:25-CR-00703-MWC

I N D I C T M E N T

[50 U.S.C. § 4819(a) and (b); 15 C.F.R. §§ 736.2(b)(1), 764.2, and Part 774, Supp. No. 1: Conspiracy to Violate the Export Control Reform Act and the Export Administration Regulations; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture]

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

I. Background

1. ALX Solutions Inc. ("ALX") was a closely held corporation located in El Monte, California, that was established on or about October 27, 2022. ALX also used addresses in Philadelphia, Pennsylvania, and Denver, Colorado.

2. Defendant [redacted]

3. Defendant CHUAN GENG ("GENG"), a citizen of the People's Republic of China, was the Chief Financial Officer of ALX.

4. Defendant SHIWEI YANG ("YANG"), a citizen of the People's Republic of China, was the Secretary of ALX.

5. Together, defendants [redacted] GENG, and YANG controlled and operated ALX, which included making purchases for ALX, communicating with ALX customers, coordinating international shipments of products sold by ALX, and managing ALX's warehouse in El Monte, California.

II. Relevant Statutory and Regulatory Background

6. The Export Control Reform Act ("ECRA") provides, among other things, that the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items be controlled, 50 U.S.C. § 4811, and grants the President the authority to control such activities, 50 U.S.C. § 4812. ECRA further grants to the Secretary of Commerce the authority to establish the applicable regulatory framework. 50 U.S.C. § 4813.

7. The Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774, restricts the export of items for national security, foreign policy, and other interests of the United States as reflected in international obligations and arrangements. 15 C.F.R. § 730.6. It also restricts exports of items that could make significant contributions to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. Id. § 742.4. The EAR imposes licensing and other requirements for items subject to the EAR to be lawfully exported

from the United States or lawfully reexported from one foreign destination to another. Id. § 730.7.

8. The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"), published at Title 15, Code of Federal Regulations, Part 774, Supplement Number 1. Items on the CCL are categorized by an Export Control Classification Number ("ECCN") based on their technical characteristics. Each ECCN has export control requirements depending on the destination, end user, and end use.

9. Beginning on or around October 7, 2022, BIS began amending the EAR to implement new controls on advanced computing integrated circuits ("ICs"), computer commodities that contain ICs, and certain semiconductor manufacturing items. See 15 C.F.R. § 744.23; 87 Fed. Reg. 62186. In addition, BIS imposed additional export controls on certain advanced computing semiconductor chips (e.g., chips, advanced computing chips, integrated circuits, or ICs), transactions for supercomputer end-uses, and transactions involving certain entities on the Entity List. These restrictions applied to high-performance ICs that are useful in data center processing and artificial intelligence. The restrictions applied to China (including Hong Kong).[1] On or about October 25, 2023, BIS released two interim final rules (effective on November 17, 2023) that expanded export controls related to advanced computing and semiconductors, aimed at China and other countries of national security concern.

10. Items that fall within the scope of the EAR but are not specifically controlled for export are given the classification of

---

[1] Under the EAR, Hong Kong is generally treated as any other city in mainland China. See E.O. 13936.

"EAR99." EAR99 items generally consist of low-technology consumer goods and do not require a license in most situations.

11. NVIDIA A100 Graphics Processing Units ("GPUs"), H100 GPUs, PNY GE Force RTX 4090 GPUs, and GeForce RTX 5090 GPUs are all classified under ECCN 4A090.a. Items classified under ECCNs 4A090.a, 5A002.z, and 5A992.z are controlled for regional stability reasons and require a license for export to China, among other places. *See* 15 C.F.R. § 742.6(a)(6).

12. At no time did defendants [redacted] GENG, or YANG, or their company ALX, apply for, receive, or possess a license from BIS to export or reexport any items classified under ECCNs 4A090.a, 5A002.z, 5A992.z, or any other ECCN to China (including Hong Kong) or any other place.

III. Export and Shipping Records

13. Pursuant to U.S. law and regulations, exporters or their authorized agents, such as shippers or freight forwarders, are required to file certain forms and declarations concerning the export of goods and technology from the United States. Typically, those documents are filed electronically through the Automated Export System ("AES"), which is administered by the U.S. Department of Homeland Security, Customs, and Border Protection ("CBP").

14. The Electronic Export Information ("EEI") (formerly known as the Shipper's Export Declaration) is the required documentation submitted to the U.S. Government through the AES in connection with an export shipment from the United States. Exporters or their authorized agents are required to file accurate and truthful EEI for every export of goods from the United States with a value of $2,500 or more. The EEI is also required regardless of the value of the

goods if the goods require an export license. 15 C.F.R. §§ 30.2, 758.1.

15. The purpose of these requirements is to strengthen the U.S. Government's ability to prevent the export of certain items to unauthorized destinations and end users because the EEI and AES aid in targeting, identifying, and when necessary, confiscating suspicious or illegal shipments prior to export. 15 C.F.R. § 30.1(b).

16. In addition, the BIS-711 Form, titled "Statement by Ultimate Consignee[2] and Purchaser," is a form submitted to the Department of Commerce by exporters, shippers, and freight forwarders that requires the identification of the end user and end use of goods to be exported from the United States. See 15 C.F.R. § 748.11. The BIS-711 Form seeks assurances from the ultimate consignee and purchaser that the items will not be misused, transferred, or reexported in violation of the EAR. The BIS-711 Form requires the ultimate consignee and purchaser to certify, among other things, that all of the facts contained in the form are true and correct and to acknowledge that the making of any false statements or concealment of any material fact in connection with the form may result in imprisonment or fine, or both, and denial, in whole or in part, of participation in U.S. exports and reexports.

17. A material part of the EEI and AES, as well as other export filings, including the BIS-711 Form, is information concerning the

[2] An ultimate consignee is defined in Title 15, Code of Federal Regulations, Part 748.5(e) as "the principal party in interest located abroad who receives the exported or reexported items. The ultimate consignee is not a forwarding agent or other intermediary, but may be the end-user."

end user and ultimate destination of the export. The identity of the end user may determine whether the goods: (a) may be exported without any specific authorization or license from the U.S. Government; (b) may be exported with the specific authorization or license from the U.S. Government; or (c) may not be exported from the United States.

IV. Overview of the Criminal Scheme

18. Beginning on an unknown date but not later than in or around August 2023, and continuing through on or about July 31, 2025, defendants [redacted] GENG, and YANG conspired with each other and persons known and unknown to the Grand Jury to procure sensitive export-controlled items, classified under ECCNs 4A090.a, 5A002.z, or 5A992.z, including advanced computing semiconductor chips (or GPUs) and servers, and then illegally export those controlled items to China.

19. As part of the scheme, defendants [redacted] GENG, and YANG, and their co-conspirators procured millions of dollars' worth of export-controlled chips and high-end computer servers from U.S. suppliers and caused them to be exported to China without the required licenses, primarily by shipping the export-controlled items through Malaysia and Singapore.

20. Defendants [redacted] GENG, and YANG were aware that the export of these types of items to China was restricted and they intentionally evaded and attempted to evade export control laws and detection by the authorities. For example:

a. In text communications on or about March 27, 2025, that include defendants [redacted] GENG, and YANG, and two other co-conspirators whose identities are known to the Grand Jury

("Unindicted Co-conspirator-1" and "Unindicted Co-conspirator-2"), the group discussed the shipment of A100 GPUs -- the export of which to China requires a license because the items are classified as ECCN 4A090.a. Unindicted Co-conspirator-1 asked why the items were not being shipped directly, to which defendant [redacted] responded to the group, in sum and substance, "[i]t is restricted products . . . ."

b. In a message on or about June 26, 2025, defendant [redacted] instructed defendant YANG to carefully inspect a Quanta H200 server -- which is export controlled, classified as ECCN 4A090.a, and requires a license for export to China -- being sent to China, stating, in sum and substance, "see if there is anything such as a tracker on it. You must look for it carefully. Nowadays, the f[**]king US Trump administration, who knows what they will do."

c. On or about July 1, 2025, defendant [redacted] sent messages to defendant GENG, defendant YANG, Unindicted Co-conspirator-1, and Unindicted Co-conspirator-2 that said, in sum and substance, "[d]on't ship non-restricted stuff to Malaysia[.] Cost is too high[.]" In response to a question from GENG, Unindicted Co-conspirator-1 said, in sum and substance, "[n]on-restricted products can be shipped directly using ALX[.] Direct shipment to Hong Kong."

d. On or about July 29, 2025, defendants [redacted] GENG, and YANG, Unindicted Co-conspirator-1, and Unindicted Co-conspirator-2, discussed, in a group chat, exporting H100 GPUs -- which are export controlled, classified as ECCN 4A090.a, and require a license for export to China -- to Hong Kong. YANG said, in sum and substance, "[t]he cards are made in Taiwan, but 'assembled in USA' is written on the machines," to which defendant [redacted] responded, in sum and substance, "[r]emove it."

COUNT ONE

[50 U.S.C. § 4819(a) and (b); 15 C.F.R. §§ 736.2(b)(1), 764.2, and Part 774, Supp. No. 1]

[ALL DEFENDANTS]

21. The Grand Jury incorporates and realleges the allegations set forth in paragraphs 1 through 20 above, as if fully set forth herein.

A. OBJECT OF THE CONSPIRACY

22. Beginning on an unknown date but no later than on or about August 7, 2023 and continuing through on or about July 31, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendants [redacted] CHUAN GENG ("GENG"), and SHIWEI YANG ("YANG"), and others known and unknown, knowingly and willfully conspired to export and cause to be exported from the United States to the People's Republic of China various items subject to the Export Administration Regulations and on the Commerce Control List, including graphics processing units and servers, without having first obtained a license from the United States Department of Commerce, in violation Title 50, United States Code, Section 4819 and Title 15, Code of Federal Regulations, Sections 736.2, 764.2, and Part 774, Supplement Number 1.

B. MANNER AND MEANS OF THE CONSPIRACY

23. The object of the conspiracy was to be accomplished in substance as follows:

a. Defendants [redacted] GENG, and YANG, and their co-conspirators provided documentation to the U.S.-based sellers of the export-controlled items that misrepresented the items would be going

to permissible end users and end destinations that did not require an export license. However, these end users and end destinations were not the true end users and end destinations, and instead, defendants [redacted] GENG, and YANG, and their co-conspirators conspired to send the export-controlled items to China (including Hong Kong) without obtaining the required licenses.

b. Defendants [redacted] GENG, and YANG, and their co-conspirators used ALX to export controlled items to China without the required licenses, by making and causing to be made false statements, material misrepresentations, and omissions in EEI filings and related financial, shipping, and end-user related documents and records to conceal the nature of the illicit exports. Among other things, defendants [redacted] GENG, and YANG, and their co-conspirators did and would cause fraudulent classification designations to be listed in EEI filings to conceal that they were, in fact, illegally shipping export-controlled technology to China.

c. Defendants [redacted] GENG, and YANG, and their co-conspirators used ALX to export controlled items to countries, like Malaysia and Singapore, where no license was required for items classified as ECCN 4A0990.a, 5A002.z, and/or 5A992.z. Defendants [redacted] GENG, and YANG, and their co-conspirators, through ALX, then re-exported or caused the re-export of those controlled items to China, for which a license was required.

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offense set forth in Count One of this Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a) all right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been

//

//

placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/

Foreperson

BILAL A. ESSAYLI
Acting United States Attorney

DAVID T. RYAN
Assistant United States Attorney
Chief, National Security Division

IAN V. YANNIELLO
Assistant United States Attorney
Chief, Terrorism and Export
Crimes Section

COLIN S. SCOTT
Assistant United States Attorney
Terrorism and Export Crimes
Section

JENNA W. LONG
Assistant United States Attorney
Terrorism and Export Crimes
Section